# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

EDINBURGH HOLDINGS, INC., : 
:
      Plaintiff, :
:
      v. :    **C.A. No. 2017-0500-JRS**
:
EDUCATION AFFILIATES, INC., :
RETS TECH CENTER INC., and :
JLL PARTNERS FUND IV, L.P., :
:
      Defendants. :
------------------------------------------------ :
EDUCATION AFFILIATES INC. and :
RETS TECH CENTER, INC., :
:
      Counterclaim Plaintiffs, :
:
      v. :
:
EDINBURGH HOLDINGS, INC., :
:
      Counterclaim Defendant. :
------------------------------------------------ :
EDUCATION AFFILIATES INC. and :
RETS TECH CENTER, INC., :
:
      Third-Party Plaintiffs, :
:
      v. :
:
STEVEN J. KNIER, DAVID MANTICA, and :
FRANK BEANLAND, :
:
      Third-Party Defendants. :

# MEMORANDUM OPINION

Date Submitted: March 20, 2018
Date Decided: June 6, 2018

Ryan P. Newell, Esquire and Kyle Evans Gay, Esquire of Connolly Gallagher LLP, Wilmington, Delaware, and Lee M. Whitman, Esquire and Samuel A. Slater, Esquire of Wyrick Robbins Yates & Ponton LLP, Raleigh, North Carolina, Attorneys for Plaintiff and Counterclaim Defendant Edinburgh Holdings, Inc. and Third-Party Defendants Steven J. Knier, David Mantica and Frank Beanland.

Douglas D. Herrmann, Esquire and Christopher B. Chuff, Esquire of Pepper Hamilton LLP, Wilmington, Delaware, Attorneys for Defendants, Counterclaim Plaintiffs and Third-Party Plaintiffs Education Affiliates Inc. and RETS Tech Center, Inc.

**SLIGHTS, Vice Chancellor**

In 2013, the American Society of Professional Education, Inc. ("ASPE") sold its proprietary education business to a subsidiary of Education Affiliates, Inc. ("EA") (the "Transaction"). The Transaction was memorialized in an Asset Purchase Agreement dated August 14, 2013 (the "APA"). The APA provides that the buyer would pay a set price upon closing and then make future payments contingent upon the acquired business' achieving certain revenue targets post-closing. The contingent purchase price was payable in annual installments over four years. After closing, ASPE's management continued to operate ASPE's former business (the "ASPE Business Unit"), which became one of EA's several educational offerings.

EA and its wholly-owned subsidiary, RETS Tech Center, Inc. ("RETS"),[1] made the contingent purchase price payments as provided in the APA for fiscal years 2013, 2014 and 2015. In 2017, however, Buyers refused to make the final payment (for fiscal year 2016), alleging that the payment obligation was excused as a result of Transaction-related misconduct on the part of ASPE's former management— Steven Knier, David Mantica and Frank Beanland.

---

[1] The original buyer, EA's subsidiary, Fortis ASPE, Inc. ("Fortis"), assigned its rights and obligations under the APA to RETS following the Transaction. While only Fortis is a party to the APA, for the sake of clarity, where appropriate, I refer to EA, RETS, Fortis and JLL Partners Fund IV, L.P. ("JLL"), another EA affiliate and party defendant, collectively as "Buyers." The entities are distinguished where necessary.

ASPE, which changed its name to Edinburgh Holdings, Inc. ("Edinburgh")[2] post-closing, responded by filing a complaint in this Court on July 10, 2017, in which it seeks to recover the remaining contingent purchase price payment due under the APA. Edinburgh's complaint alleges, among other things, that Buyers have breached (1) the APA by failing to pay the remaining amounts; and (2) the covenant of good faith and fair dealing inherent in the APA "by preventing, refusing, and obstructing" the required payment.

Buyers answered Edinburgh's complaint on September 8, 2017, and brought counterclaims against Edinburgh and third-party claims against Knier, Mantica and Beanland.[3] Specifically, Buyers allege that (1) ASPE and Knier fraudulently induced Buyers to sign the APA by falsely promising revenue growth; (2) ASPE, Knier, Mantica and Beanland breached the APA by mismanaging the ASPE Business Unit after the Transaction's closing; and (3) Knier, Mantica and Beanland breached fiduciary duties owed to Buyers and the ASPE Business Unit by failing to operate the ASPE Business Unit in compliance with the APA and in a manner that would allow the business to achieve "promised" revenue targets.

---

[2] Edinburgh and ASPE refer to the same company; I use both names throughout this opinion as appropriate depending upon the context.

[3] Where appropriate, I refer to Edinburgh/ASPE and third-party defendants, Knier, Mantica and Beanland, in their capacity as officers of ASPE, as "Sellers."

Buyers have moved to dismiss Count V of Edinburgh's complaint (for breach of the implied covenant of good faith and fair dealing) as duplicative of Edinburgh's breach of contract claim. Sellers have moved to dismiss all of Buyers' counterclaims and the third-party complaint.[4] For the reasons that follow, Buyers' motion to dismiss Count V of Edinburgh's complaint is GRANTED. Sellers' motion to dismiss is GRANTED as to the fraudulent inducement and breach of fiduciary duty claims, and DENIED as to the breach of contract claim.

## I.  BACKGROUND

In accordance with Court of Chancery Rule 12(b)(6), the facts are drawn from the pleadings, documents incorporated into the pleadings by reference and matters of which the Court may take judicial notice.[5]

### A.  Parties and Relevant Non-Parties

Plaintiff and Counterclaim Defendant, Edinburgh, is a North Carolina corporation headquartered in Cary, North Carolina.[6] Edinburgh operated under the

---

[4] More precisely, Edinburgh has moved to dismiss the counterclaims and Knier, Mantica and Beanland have moved to dismiss the third-party claims. For ease of reference, I describe their motions collectively as "Sellers'" motion.

[5] *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 612–13 (Del. 1996).

[6] Verified Compl. ("Compl") ¶ 2.

name ASPE until the Transaction, whereby it sold "the branding associated with the name 'ASPE'" to RETS.[7]

ASPE (and now, the ASPE Business Unit) offers courses primarily to large companies seeking to train their employees "in a particular technical skill such as Project Management, Business Analysis, Agile Methods, Software Testing, Microsoft SharePoint, and DevOps."[8] It derives its revenues primarily from tuition payments.[9]

Defendant, JLL, is a Delaware limited partnership headquartered in New York. JLL formed and funded EA in 2004 "to pursue a built-up strategy in the post-secondary education industry focused primarily in the healthcare sector."[10]

Defendant, Counterclaimant and Third-Party Plaintiff, EA, is a Delaware corporation headquartered in Baltimore, Maryland. At the time of the Transaction, "EA was a fifty-campus proprietary vocational education company."[11] Its students are mainly professionals seeking career changes or advancement.[12]

---

[7] Compl. ¶ 2.

[8] Compl. ¶¶ 9–10.

[9] Compl. ¶ 13.

[10] Compl. ¶ 18.

[11] Compl. ¶ 16; Answer, Affirmative Defenses, Countercl. & Third Party Compl. ("Answer") ¶ 16.

[12] Compl. ¶ 19.

Non-party, Fortis, is a wholly-owned subsidiary of EA that was formed to serve as EA's acquisition vehicle for the Transaction.[13] Fortis is a party to the APA and is referred to therein as "Buyer."[14] Following the Transaction's consummation, Fortis "assigned its rights and obligations under the APA"[15] to Defendant, Counterclaimant and Third-Party Plaintiff, RETS, an Ohio corporation with operations throughout the United States.[16] RETS is also a wholly-owned subsidiary of EA.[17]

Third-Party Defendant, Steven J. Knier, founded ASPE in 2002. Prior to the Transaction, he was ASPE's CEO and one of its stockholders.[18] He subsequently became an officer of the ASPE Business Unit pursuant to an employment agreement dated September 11, 2013, and executed in connection with the Transaction.[19]

Third-Party Defendant, David Mantica, was ASPE's president and an ASPE stockholder prior to the Transaction. He subsequently became the president of the

---

[13] Compl. ¶¶ 1, 33.

[14] Compl., Ex. A ("APA"), pmbl.

[15] Countercl. & Third Party Compl. ("Countercl.") ¶ 2; *see also* Compl., Ex. B (Assignment Ltr.).

[16] Compl. ¶ 4; Answer ¶ 4.

[17] Compl. ¶ 4; Answer ¶ 4.

[18] Compl. ¶ 14.

[19] Countercl. ¶ 4.

5

ASPE Business Unit pursuant to his own employment agreement dated September 11, 2013.[20]

Third-Party Defendant, Frank Beanland, was the CFO and a stockholder of ASPE prior to the Transaction.[21] He became the vice-president of the ASPE Business Unit following the Transaction, again pursuant to an employment agreement dated September 11, 2013.[22]

## B.    Regulatory Requirements Applicable to Proprietary Schools

Under federal law, proprietary schools such as EA and ASPE may not derive more than 90% of their revenues from Department of Education ("DOE") Title IV federal student aid funds, meaning that at least 10% of revenues must come from non-governmental (*i.e.*, private) sources.[23] In the proprietary school industry, this "revenue mix" requirement is known as the "90-10 Rule," and revenues derived from private sources are referred to as "10-Money."[24] According to Sellers, EA's pre-Transaction revenue mix violated the 90-10 Rule, or at least came very close to

---

[20] Compl. ¶ 26; Countercl. ¶ 5.

[21] Compl. ¶ 59; Countercl. ¶ 6.

[22] Countercl. ¶ 6.

[23] 20 U.S.C. § 1094(a)(24) ("In the case of a proprietary institution of higher education [], such institution will derive not less than ten percent of such institution's revenues from sources other than funds provided under this subchapter . . . or will be subject to [] sanctions . . . .").

[24] Compl. ¶ 21.

6

doing so. Thus, Sellers contend, EA's "primary interest in the [T]ransaction was satisfying the 90-10 Rule revenue requirements," given that ASPE was in solid compliance with the rule.[25]

### C.    The Transaction Negotiations

In early 2013, EA retained a broker to contact ASPE about a possible transaction.[26] The parties met shortly after this initial contact, although their accounts of the first meeting differ. According to Buyers, Knier and Mantica visited EA's offices in Baltimore in January 2013 and "provided a presentation to Duncan Anderson, EA's CEO."[27] According to Sellers, Knier and Mantica first "presented an overview of ASPE's business in a PowerPoint slide presentation" during a May 15, 2013 meeting at ASPE's offices in North Carolina.[28] Although the parties disagree regarding the timing and location of the initial meeting, they do agree that Knier and Mantica at some point presented to EA information regarding ASPE's business and the strengths and capabilities of its management.[29] The presentation included revenue projections for fiscal years 2014–2016 as well as an explanation

---

[25] *See* Compl. ¶ 28.

[26] Countercl. ¶ 21; Compl. ¶¶ 14–16.

[27] Countercl. ¶ 23.

[28] Compl. ¶ 26.

[29] Compl. ¶ 26; Countercl. ¶ 23.

7

of contingencies and assumptions with regard to those estimates.[30] The projected revenues were $15.9 million for 2014, $18.5 million for 2015 and $20.5 million for 2016.[31]

According to Buyers, following the initial presentation in January 2013, during a May 15, 2013 meeting at ASPE's offices in Cary, North Carolina (the parties' first meeting according to Sellers), Knier and Mantica "again[] made representations as to the revenue and profit growth that the ASPE Business Unit would achieve after the [Transaction]."[32] At this May 15 meeting, Anderson and EA's CFO, Steve Budosh, toured ASPE's offices, met ASPE's management and got a sense of ASPE's business.[33]

The parties thereafter began conducting due diligence in anticipation of a potential ASPE-EA transaction.[34] In connection with the due diligence process,

---

[30] Compl. ¶¶ 23, 26.

[31] Compl. ¶ 26; Countercl. ¶ 23. The presentation also indicated "ASPE would earn approximately $1.4 million, $1.7 million, and $2.1 million in Net Profits in 2014, 2015, and 2016, respectively." Countercl. ¶ 23.

[32] Countercl. ¶ 25; Countercl. ¶ 24.

[33] Compl. ¶ 25; Countercl. ¶ 24.

[34] Compl. ¶ 27; Countercl. ¶ 26.

8

EA retained a Washington, DC-based law firm specializing in DOE Title IV compliance to evaluate ASPE's revenue qualification and revenue mix.[35]

Buyers allege that their "initial offer to purchase the ASPE Business Unit was a lump sum . . . [to be] paid at closing [and that] . . . [their] initial offer was based off of ASPE's historical performance, mainly its recent EBITDA and revenue figures."[36] According to Buyers, "Sellers forcefully rejected that offer, and took the position that such an offer did not properly value the ASPE Business Unit given the revenue and profit growth . . . that the Unit would achieve."[37] Consequently, the parties "began negotiating earn-out provisions" based on Sellers' revenue representations—which Buyers define as "Promised Revenues and Profits."[38]

## D. The APA

On August 14, 2013, following due diligence, Edinburgh (then ASPE), ASPE's stockholders (including Knier, Mantica and Beanland) and Fortis executed the APA.[39] Here, the APA's purchase price and contingent payment provisions are most relevant and each is discussed below.

---

[35] Compl. ¶ 29.

[36] Countercl. ¶ 29.

[37] Countercl. ¶ 30.

[38] Countercl. ¶¶ 23, 31.

[39] APA, pmbl.

## 1. The Purchase Price

The APA, at Section 2.1, divides the "Purchase Price" into two parts: (1) the Initial Purchase Price of $6 million less certain enumerated amounts due at closing,[40] and (2) the Contingent Purchase Price.[41] According to Section 2.1(b), the Contingent Purchase Price is calculated pursuant to a three-step formula:

1. 50% of the Pre-Tax Profits[42] for fiscal years 2013, 2014 and 2015 if the Total Revenue[43] for the relevant fiscal year was less than $13 million,

---

[40] Specifically, the Initial Purchase Price is equal to "(i) $6,000,000, minus (ii) $100,000 (the 'Holdback Amount'), which Holdback Amount shall be deposited by Buyer into the Escrow Account to be held in escrow by the Escrow Agent pursuant to the terms of the Escrow Agreement . . . ; minus (iii) the amount of the Assumed Debt assumed by Buyer at the Closing . . . ; minus (iv) [t]he amount, if any, by which the Estimated Net Asset Value [] of [ASPE] is less than $0.00 (the 'Reference NAV'); plus (v) [t]he amount, if any, by which the Estimated Net Asset Value is greater than the Reference NAV as of the Closing Date ([] as adjusted pursuant to Section 2.4 . . . .)." APA § 2.1(a).

[41] The APA defines the Initial Purchase Price and the Contingent Purchase Price together as the "Purchase Price." APA § 2.1(b).

[42] The APA defines "Pre-Tax Profits" as "an amount equal to (a) the income [] of Buyer relating to the Business [defined as 'all of the property and assets of the business of owning and operating a for-profit training company for specialized business and professional markets currently conducted by [ASPE].' APA, pmbl.] before income taxes for reporting purposes (after deducting all service and direct costs, salaries and employee benefits and indirect costs directly identifiable to the Business and selling, general and administrative expenses in a manner consistent with GAAP), less (b) all depreciation and amortization expense and all interest expense deducted in calculating income for reporting purposes (except as modified below), in accordance with GAAP, and in a manner materially consistent with [ASPE's] historical financial reporting [excluding a list of specific items]." APA § 10.12(oo) (Pre-Tax Profit definition).

[43] "Total Revenue" is defined as "the total net revenue recognized by Buyer with respect to the Business for services provided by Buyer after the Closing determined in accordance with GAAP applied consistently with [ASPE's] historical financial reporting, provided that in the event of any conflict between GAAP and [ASPE's] historical financial reporting, GAAP shall govern." APA § 10.12(uu) (Total Revenue definition).

or 65 % of the Pre-Tax Profits if Total Revenue was equal to or greater than $13 million[44];

2. If the aggregate amount paid under the formula set forth above, as of December 31, 2016, is less than $2 million, then Buyer will pay an additional sum of $2 million less any amounts already paid towards the Contingent Purchase Price[45]; *and*

3. If revenues for the fiscal year ending December 31, 2016 are $8 million or more, then buyer will pay 25% of the 2016 revenues (the "Total Revenue Earnout") *plus* cumulative losses over the period from the closing date through December 31, 2016.

Both parties maintain that the Contingent Purchase Price formula is unambiguous on its face and as applied.

## 2. Management of the ASPE Business Unit During the Contingent Payment Period

Per Section 2.1(f) of the APA, following the Transaction's closing, ASPE's business would become "part of a larger, integrated educational institution" (namely, EA) and thereafter would be referred to as the "ASPE Business Unit."[46] The ASPE Business Unit was to "(i) [be] manage[d] using the current management . . . subject to the terms of their employment agreements, and conduct

---

[44] "Pre-Tax Profits and Total Revenue shall be calculated solely with respect to the Business and shall not reflect the profits or revenues attributable to Buyer or any of its Affiliates." APA § 2.1(b)(i).

[45] The APA defines this amount less any indemnification amounts offset pursuant to Section 8.6 of the APA as the "Fixed EO Obligation." APA § 2.1(b)(iii).

[46] APA § 2.1(f).

its activities in a reasonable manner consistent with its past practices . . . and (ii) report, budget and forecast . . . its educational and financial status to the Buyer and/or the integrated educational institution, if applicable."[47]  Section 2.1(f) further provides that the ASPE Business Unit would "be afforded the ability to make and execute strategies and plans to grow [the] business with full cooperation from Buyer provided that those plans are: (sic) fully compliant with all applicable laws, enable revenue growth consistent with the approximate current mix of Program Revenues and non-Program Revenues, and do not result in fiscal year losses or requests for additional capital over the contingent payment period."[48]

### E.  The Related Agreements

As noted, at the time of closing of the Transaction, Knier, Mantica and Beanland, along with ASPE's remaining management, entered into employment agreements with Buyers providing for their post-closing employment with the ASPE Business Unit (the "Employment Agreements").[49]  Buyers allege that, in

---

[47] *Id.*

[48] *Id.*  The APA defines "Program Revenues" as "those revenues generated by programs offered by [ASPE] that lead to an industry-recognized credential or certificate, or prepare students to take an examination for an industry-recognized credential or certification issued by an independent third party . . . ."  APA § 10.12(pp) (Program Revenues definition).

[49] Countercl. ¶ 41; *see also* Memo. of Law in Supp. of Countercl. Def. & Third Party Defs.' Mot. to Dismiss ("Sellers' Opening Br."), Ex. A (Knier Emp't Agmt.).  While I reference the Employment Agreements here for context, my decision does not turn on their construction or enforcement.

seeking post-closing employment, "Knier assured [Buyers] that he and his management team [were] strategic, focused, and nimble, and more than capable of identifying and capturing future profitable [] growth opportunities, regardless of any changing market dynamics."[50] In that spirit, Knier, Mantica and Beanland were able to negotiate for significant autonomy in running the ASPE Business Unit as reflected in their Employment Agreements.

On August 14, 2013, JLL and Fortis also entered into a letter agreement (the "JLL Letter Agreement") pursuant to which JLL committed to make the Contingent Purchase Price payments when due "if and to the extent that [Fortis] (or Transferee, as applicable) is unable to make such payment."[51] Two months later, on October 10, 2013, Fortis assigned all its "rights and obligations" under the APA to RETS.[52]

### F.    ASPE Business Unit Operations After the Transaction

Following the closing, EA placed James Herbst, EA's Regional Vice President, in ASPE's headquarters in Cary, North Carolina.[53] Herbst met weekly with ASPE Business Unit management to oversee the unit's revenues and

---

[50] Countercl. ¶ 42.

[51] Compl., Ex. C (JLL Ltr. Agmt.), at 2.

[52] Compl., Ex. B (Assignment Ltr.).

[53] Compl. ¶ 58; Answer ¶ 58.

operations.[54]  He also held monthly financial and operations calls with Anderson, Budosh and other EA executives to update them on the unit's progress.

In addition to placing Herbst in ASPE's North Carolina headquarters, EA facilitated information flow by requiring the ASPE Business Unit to participate in yearly budget reviews and financial audits.[55]  EA also asked Knier, Mantica and Beanland to send weekly reports to EA with the week's cash reports, sales receipts and qualified 10-Money receipts.[56]  Finally, it is alleged that EA reviewed and approved the ASPE Business Unit's annual budgets prior to each fiscal year with guidance from Herbst.[57]

The approved budgets for fiscal years 2014–2016 forecast approximately $13 million in revenue each year.[58]  The ASPE Business Unit reported actual revenues of $12,022,519 in 2013, $12,194,480 in 2014, $12,461,993 in 2015 and

---

[54] Compl. ¶ 58; Answer ¶ 58.

[55] Compl. ¶¶ 58, 63; Answer ¶ 58.

[56] Compl. ¶¶ 61–62; Answer ¶¶ 61–62.

[57] Compl. ¶ 63.  Buyers admit that "ASPE presented [EA] with annual budgets" but deny that "EA reviewed and approved these budgets prior to each fiscal year."  Instead, they state they "are without sufficient knowledge" to admit or deny whether Herbst provided guidance to ASPE management on EA's annual budget expectations.  Answer ¶ 63.

[58] Compl. ¶ 63; Answer ¶ 63.

14

$12,635,899 in 2016.[59]  These revenue results triggered Contingent Purchase Price payments for fiscal years 2013, 2014 and 2015 in keeping with the APA's Contingent Purchase Price requirements.[60]

On April 13, 2017, Anderson sent a letter to Knier claiming that Knier and his team had breached the APA, the covenant of good faith and fair dealing inherent in the APA and their fiduciary duties to Buyers and the ASPE Business Unit by failing to achieve the revenues "promised" by ASPE and Knier during the APA negotiations.  Anderson declared that, as a result of these breaches, Buyers would not pay the remaining Contingent Purchase Price installment of approximately $4,736,000 for fiscal year 2016.[61]

## G.    Procedural Posture

Edinburgh filed its Verified Complaint (the "Complaint") on July 10, 2017.[62] The Complaint sets forth five counts:

---

[59] Compl. ¶ 64.  Buyers admit the revenue numbers for 2014 through 2016 but deny the alleged 2013 revenue number.  Answer ¶ 64.

[60] Compl. ¶¶ 71–73 & Exs. F, G, H (Notices of Contingent Purchase Price Payment Earnout Statement 2014, 2015, 2016).

[61] Compl. ¶¶ 74, 76.

[62] Prior to filing this action, Sellers "engaged counsel to proceed through the dispute resolution provisions in the APA, which called for [sic] certain time period for good faith negotiation and appointment of an Independent Auditor to resolve the dispute over the Contingent Purchase Price."  Compl. ¶ 78.  According to Sellers, "Defendants refused to participate in the APA-defined dispute resolution process in the [required] time frame . . . ."

- Count I seeks a declaratory judgment that ASPE and Knier did not fraudulently induce EA to execute the APA and that ASPE and Knier's team did not breach any contractual, fiduciary or implied duties.[63]

- Count II alleges that RETS breached "the APA by failing to pay the remaining portion of the Contingent Purchase Price" that was due and payable to Edinburgh.[64]

- Count III alleges that EA breached "the APA by failing to pay the remaining portion of the Contingent Purchase Price" that was due and payable to Edinburgh, but that RETS refused to pay.[65]

- Count IV alleges that JLL breached the JLL Letter Agreement by failing to pay Edinburgh the Fixed EO Obligation.[66]

- Count V alleges that EA, RETS and JLL breached the implied covenant of good faith and fair dealing by "act[ing] in bad faith and with the sole purpose of preventing, refusing, and obstructing [Edinburgh's] 2016 Contingent Purchase Price payment so as to deprive [Edinburgh] of the fruits of its bargain."[67]

---

*Id.* ¶ 79. Buyers deny that allegation and assert, "the parties' dispute is not the type resolvable by the APA-defined dispute resolution process." Answer ¶ 79.

[63] Compl. ¶ 87.

[64] Compl. ¶ 93.

[65] Compl. ¶ 99.

[66] Compl. ¶¶ 110–11.

[67] Compl. ¶ 112. Edinburgh's implied covenant claim is mistakenly designated as Count IV in the Complaint. Following Buyers' lead in the briefing, I will refer to this claim as Count V for the sake of clarity.

Buyers answered Edinburgh's Complaint on September 8, 2017, and brought counterclaims against Edinburgh and a third-party complaint against Knier, Mantica and Beanland.[68] Specifically, the responsive pleading sets forth three counts:

- Count 1 alleges that Edinburgh and Knier fraudulently induced Buyers to execute the APA.

- Count 2 alleges that Sellers breached the APA by "fail[ing] to act in a reasonable manner consistent with ASPE's past practices, fail[ing] to make and execute strategies and plans that enabled the ASPE Business Unit to achieve the promised revenue growth, and fail[ing] to report, budget, and forecast in line with the budgets and forecasts provided . . . prior to Closing."[69]

- Count 3 alleges that the third-party defendants breached their fiduciary duties to Buyers and the ASPE Business Unit "by acting with reckless indifference and deliberate disregard to [Buyers], and failing to act in good faith to maximize the value [for Buyers] and the ASPE Business Unit over the long term."[70]

On December 20, 2017, Buyers filed a motion to dismiss Edinburgh's Count V (the implied covenant claim) pursuant to Court of Chancery Rule 12(b)(6). That same day, Sellers filed a motion to dismiss all of Buyers' counterclaims and third-party claims under Court of Chancery Rules 12(b)(6) and 9(b). For the reasons explained below, Buyers' motion to dismiss is granted, and Sellers' motion to dismiss is granted in part (as to Counts 1 and 3) and denied in part (as to Count 2).

---

[68] More precisely, only EA and RETS brought the counterclaims and third-party complaint.

[69] Countercl. ¶ 72.

[70] Countercl. ¶ 77.

## II. ANALYSIS

On a motion to dismiss under Chancery Rule 12(b)(6),[71] the court accepts the complaint's well-pled allegations as true and draws all reasonable inferences therefrom in favor of the party opposing the motion.[72] The court will grant a motion to dismiss only if it determines "with reasonable certainty that a plaintiff could prevail on no set of facts that can be inferred from the pleadings."[73]

### A. Buyers' Motion to Dismiss the Implied Covenant Claim

Under Delaware law, "the implied covenant of good faith and fair dealing attaches to every contract by operation of law."[74] In essence, the implied covenant

---

[71] Buyers have brought their motion under Rule 12(b)(6) even though they have answered the Complaint and, therefore, should have brought a motion for judgment on the pleadings. Under Chancery Rule 12(c), the "court will grant a motion for judgment on the pleadings only where there are no material issues of fact and the movant is entitled to judgment as a matter of law." *NBC Universal, Inc. v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *4 (Del. Ch. Apr. 29, 2005). "On a Rule 12(c) motion, the court takes the well-pleaded facts alleged in the complaint as true, and views those facts and any inferences drawn therefrom in the light most favorable to the nonmoving party." *Id.* A trial court must not, however, "'blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences.'" *McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del. Ch. 2000) (quoting *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999)). Because I have determined that Count V of the Complaint fails to state a claim as a matter of law, the standard by which I review the allegations in the Complaint (Rule 12(b)(6) or Rule 12(c)) ultimately does not matter.

[72] *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del. 1996).

[73] *Id.*

[74] *Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *15 (Del. Ch. Dec. 20, 2012).

18

"requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[75]

The gravamen of Count V is that Knier, Mantica and Beanland operated the ASPE Business Unit "in a manner sufficient to secure [payment of] the Contingent Purchase Price for [fiscal] year 2016," but Buyers (wrongfully) refused to make that payment.[76] According to Edinburgh, if the Court reads Section 2.1(f) of the APA to require the ASPE Business Unit (under Knier's leadership) to achieve revenue growth as alleged by Buyers, or allows a claim that Sellers made binding extra-contractual representations that Knier and his team would achieve such growth, then the "[t]he implied covenant operates to ensure that . . . [Buyers] would not deprive [Sellers] of the fruits of [the] bargain by actively preventing [Knier's team] from achieving those revenues."[77] Edinburgh maintains that Buyers prevented the ASPE Business Unit from achieving the alleged revenue thresholds by "remain[ing] singularly focused on securing 10-Money . . . [and] den[ying] [Sellers'] business

---

[75] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (citation and internal quotation marks omitted).

[76] Compl. ¶ 112.

[77] Pl.'s Resp. in Opp'n to Defs.' Mot. to Dismiss Count V of Pl.'s Verified Compl. ("Edinburgh's Answering Br.") 9.

acquisition requests [as specifically alleged] that would have helped grow ASPE and increase its revenue."[78]

Buyers move to dismiss Edinburgh's implied covenant claim as "wholly duplicative of Edinburgh's Contract Claims."[79] Specifically, they argue that Count V "(i) [is] based upon the same conduct as [Edinburgh's] Contract Claims; (ii) sets forth the same purportedly wrongful conduct that is alleged in the Contract Claims—non-payment of a portion of the Contingent Purchase Price; and (iii) seeks the same relief sought in connection with the Contract Claims—payment of the non-paid portion of the Contingent Purchase Price."[80] Buyers submit that even if the claim is not duplicative, Count V still must be dismissed because Edinburgh has failed to allege a contractual gap that the Court could fill by implying a covenant of good faith.

Before addressing the viability of Count V, I note that Edinburgh has pled its implied covenant claim more as an anticipatory defense to Buyers' extra-contractual claims than as an affirmative claim for relief. Specifically, Edinburgh invokes the implied covenant in response to Buyers' claim that, even though not mentioned in

---

[78] *Id.*

[79] Opening Br. in Supp. of Defs.' Mot. to Dismiss Count V of Pl.'s Verified Compl. ("Buyers' Opening Br.") 2.

[80] Buyers' Opening Br. 2–3.

20

the APA, Sellers made binding commitments that the ASPE Business Unit would reach certain revenue targets and have breached those commitments. According to Edinburgh, Buyers acted in bad faith to prevent Knier's team from reaching any revenue targets that may have been promised and cannot, therefore, recover for any breach of those promises. Our law recognizes that the implied covenant may be employed in this manner as a means to defend against claims of breach.[81] Thus, Sellers will be entitled to develop and present evidence that Buyers acted in bad faith to prevent Sellers' performance of any contractual obligations that might have been owed to Buyers (under the APA or otherwise).

Insofar as Count V asserts an implied covenant *claim*, however, it is improperly duplicative of Edinburgh's contract claims. The implied covenant is available only where the terms to be implied are missing from the contract[82]; it "cannot be invoked to override the express terms of a contract."[83] Thus, if the contract at issue expressly addresses a particular matter, an implied covenant claim respecting that matter is duplicative and not viable.[84]

---

[81] *Daystar Const. Mgmt., Inc. v. Mitchell*, 2006 WL 2053649, at *6 (Del. Super. Ct. July 12, 2006) ("[T]he covenant can be raised as a defense to a breach of contract claim . . . .").

[82] *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

[83] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. Apr. 15, 2009).

[84] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *12 (Del. Ch. Dec. 22, 2010); *see also Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 539 (Del. 2011) ("A party may maintain a claim for breach of the implied covenant of

21

Edinburgh's Count V is based on Buyers' "preventing, refusing, or obstructing [Edinburgh's] achievement of the Contingent Purchase Price payment."[85]   The APA, however, expressly addresses Edinburgh's right to the Contingent Purchase Price, and Edinburgh has asserted claims against Buyers for (allegedly) violating that contractual right (in Counts II, III and IV of the Complaint).[86]   That being so, Count V fails as a matter of law and must be dismissed.[87]

## B.   Sellers' Motion to Dismiss

Sellers seek to dismiss all of Buyers' counterclaims and third-party claims pursuant to Court of Chancery Rules 12(b)(6) and 9(b).   As noted, Buyers have asserted three counts: Count 1, against Edinburgh and Knier, for fraudulent inducement; Count 2, against Edinburgh and the third-party defendants, for breach of contract (with regard to the APA); and Count 3, against the third-party defendants, for breach of fiduciary duty.   In support of their motion, Sellers argue that Count 1

---

good faith and fair dealing only if the factual allegations underlying the implied covenant claim differ from those underlying an accompanying breach of contract claim").

[85] Compl. ¶ 109.

[86] Count IV seeks recovery from JLL for breach of the JLL Letter Agreement based on RETS' failure to pay the Fixed EO Obligation to Edinburgh under the terms of the APA.

[87] *See Eurofins Panlabs, Inc. v. Ricerca Biosciences, LLC*, 2014 WL 2457515, at \*19 (Del. Ch. May 30, 2014).

does not plead a fraudulent inducement claim with the requisite particularity; Count 2 is not viable because Buyers have not well pled a breach of the APA; and Count 3, the breach of fiduciary duty claim, is not viable because it is duplicative of Count 2. I address each Count in turn.

### 1. Count 1 - Fraudulent Inducement

Count 1 alleges that ASPE and Knier (i) "falsely represented to [Buyers] that any Contingent Purchase Price payment would come from and be satisfied by ASPE's new growth and additional profitability"[88]; and (ii) made representations in Section 2.1(f) of the APA that they "would conduct business in a reasonable manner consistent with past practices, report, budget, and forecast in line with the budgets and forecasts provided . . . prior to Closing . . . and achieve revenue and profit growth that ASPE and Mr. Knier promised and represented the Unit would achieve."[89] Count 1 further alleges that ASPE and Knier knew these representations were false or were recklessly indifferent to their truth when made, that they made the representations to induce Buyers to execute the APA and that Buyers "reasonably and justifiably relied" on the representations "in agreeing to the Contingent Purchase Price and entering into the APA."[90]

---

[88] Countercl. ¶ 62.

[89] Countercl. ¶ 63.

[90] Countercl. ¶¶ 65–67.

Edinburgh and Knier counter that the fraudulent inducement claim should be dismissed because (i) Buyers fail to plead fraud with particularity as required under Court of Chancery Rule 9(b); (ii) the alleged fraudulent statements concern predictions about the future, which are not actionable as a matter of Delaware law; and (iii) Buyers fail adequately to plead justifiable reliance on the alleged misrepresentations.

In reply, Buyers contend that their pleading satisfies Rule 9(b)'s requirements because they "have alleged, with specificity, the content of the fraudulent representations, who made those representations, when those representations were made, and what ASPE and Knier stood to gain from making them."[91] They further submit that they have "adequately allege[d] that the representations were false and that ASPE and Knier knew they were false [because], [c]ontrary to Knier's and ASPE's representations and promises, the ASPE Business Unit earned only $892,000 in Pre-Tax Profit from 2014–2016—just 17% of the Pre-Tax Profits that ASPE and Knier promised the Unit would make during that timeframe."[92]

Additionally, Buyers contend that each of the alleged misrepresentations is actionable because (1) part of the fraud claim "is premised upon knowing false

---

[91] Answering Br. in Opp'n to Mot. to Dismiss Countercl. & Third Party Compl. ("Buyers' Answering Br.") 24.

[92] Buyers' Answering Br. 25.

statements within the APA itself"; and (2) the "extra contractual fraudulent statements are actionable because they relate to past or present fact and/or were knowingly false when made."[93] Finally, Buyers posit that whether they reasonably relied on the alleged misrepresentations is a question of fact not suitable for resolution on a motion to dismiss.[94] Even if the question were ripe for resolution, however, Buyers argue they have adequately pled reasonable reliance because they "are undoubtedly able to rely on . . . contractual representations," and have alleged they "would never have agreed to the Contingent Purchase Price construct absent ASPE and Knier's promises and representations."[95] Since the APA does not contain an anti-reliance clause, "the APA reflects the parties' intention that [Buyers] could reasonably and justifiably rely upon extra-contractual representations . . . ."[96]

> To plead fraud (or fraudulent inducement), a plaintiff
>
> must plead facts supporting an inference that: (1) the defendants falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendants knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendants intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[97]

---

[93] Buyers' Answering Br. 28.

[94] Buyers' Answering Br. 33.

[95] Buyers' Answering Br. 34.

[96] Buyers' Answering Br. 35.

[97] *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 208 (Del. Ch. 2006).

"[T]o satisfy Rule 9(b), a complaint must allege," with particularity, "the time, place, and contents of the false representation; . . . the identity of the person making the representation; and . . . what the person intended to gain by making the representation[]."[98] While Rule 9(b) allows a plaintiff to allege knowledge generally, "where pleading a claim of fraud has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pled facts from which it can reasonably be inferred that this 'something' was knowable and that the defendant was in a position to know it."[99]

"Delaware law holds that a plaintiff cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations. In other words, a plaintiff cannot state a claim for fraud simply by adding the term 'fraudulently induced' to a complaint or alleging that the defendant never intended to comply with the agreement at issue when the parties entered into it."[100] In *Narrowstep*, this court observed that "couching an alleged failure to comply with a contract as a failure to disclose an

---

[98] *Narrowstep*, 2010 WL 5422405, at *12.

[99] *Trenwick*, 906 A.2d at 208.

[100] *Narrowstep*, 2010 WL 5422405, at *15.

intention to take certain actions arguably inconsistent with that contract is exactly the type of bootstrapping this Court will not entertain."[101]

Here, Buyers allege that:

■ "ASPE and Knier falsely represented and warranted in the APA that the ASPE Business Unit would conduct business in a 'reasonable manner consistent with past practices' and make and execute strategies and plans' that 'enable revenue growth'"[102];

■ ASPE and Knier represented to EA in January 2013, and then again in May 2013, that ASPE would achieve certain revenues after the acquisition[103];

■ "Throughout the negotiation process, ASPE and Mr. Knier continued to represent that the ASPE Business Unit would achieve substantial revenue and profit growth, and that Mr. Knier, Mr. Mantica, Mr. Beanland, and the rest of their management team would capitalize on that growth"[104];

■ "ASPE and Mr. Knier continually referred to the 'Promised Revenues and Profits' as evidence of such growth"[105];

■ ASPE and Knier "assured [Buyers] that Mr. Knier, Mr. Mantica, and their team had the knowledge, experience, and ability to achieve the promised growth"[106] and were "strategic, focused, and nimble, and more capable of identifying and capturing future profitable [] growth opportunities"[107];

---

[101] *Id.*

[102] Buyers' Answering Br. 24.

[103] Countercl. ¶ 23.

[104] Countercl. ¶ 27.

[105] *Id.*

[106] Countercl. ¶ 28.

[107] Countercl. ¶ 42.

27

- "[B]ased upon ASPE's and Mr. Knier's representations regarding the ASPE Business Unit's future growth, [Buyers] and ASPE began negotiating earn-out provisions"[108];

- "ASPE and Mr. Knier assured [Buyers], time and time again, that any Contingent Purchase Price payment would come from and be satisfied by the ASPE Business Unit's growth and additional profitability"[109]; *and*

- ASPE and Knier "repeatedly represented . . . that, in effect, there would be no payment required by [Buyers] under the [earn-out provision]" because the ASPE Business Unit would far exceed the required amounts.[110]

With regard to ASPE and Knier's knowledge, Buyers allege "ASPE and Mr. Knier knew that [their] representations were false when they were made"[111] and that "[t]he extent of the 'misses' demonstrates that ASPE and Mr. Knier never believed that the ASPE Business Unit could achieve the[] [promised] figures."[112] And finally, Buyers allege ASPE and Knier "made [] knowingly false statements to induce [Buyers]" to enter into the APA and that Buyers justifiably relied on those statements.[113]

---

[108] Countercl. ¶ 31.

[109] Countercl. ¶ 33.

[110] Countercl. ¶ 34.

[111] Countercl. ¶ 28.

[112] Countercl. ¶ 54.

[113] *Id.*

Even assuming that Buyers have alleged fraud with particularity, which is questionable,[114] Buyers' allegations fall short of a viable fraudulent inducement claim for two distinct reasons. *First*, insofar as the fraudulent inducement claim is based on the fact that the Sellers never intended to perform the APA, that claim constitutes impermissible bootstrapping.[115] Buyers have asserted that same claim in Count 2 packaged as a breach of contract claim.

*Second,* Buyers fail to plead a viable fraud claim with respect to the alleged extra-contractual representations regarding revenue projections and future management performance. Those representations are neither false representations *of fact* nor are they accompanied by well-pled allegations that ASPE or Knier *knew or believed* the representations were false or that Buyers justifiably relied on those representations. Generally, "[p]redictions about the future cannot give rise to

---

[114] Buyers allege that Sellers made the fraudulent statements "continually" and "throughout" the nine months the parties negotiated the Transaction. *See, e.g.*, Countercl. ¶¶ 27, 33 and 34. That lack of precision with respect to timing arguably falls short of the particularity requirement as set forth in Rule 9(b). *See Trusa v. Nepo*, 2017 WL 1379594, at *9 (Del. Ch. Apr. 13, 2017) ("All of the alleged misrepresentations lack the particularity required by Rule 9(b) to state a claim for fraud. First, the Complaint does not allege with particularity when the alleged misrepresentations were made—no specific dates or times [sic] frames are given."); *MHS Capital, LLC v. Goggin*, 2018 WL 2149718, at *9 n.122 (Del. Ch. May 10, 2018) (noting that "Federal courts . . . have held that alleging a time frame of six or more months is insufficient to satisfy the particularity requirement.") (citing cases).

[115] *See Narrowstep*, 2010 WL 5422405, at *15.

actionable common law fraud."[116]  In limited circumstances, however, a promise of future conduct can be actionable in fraud if the plaintiff "plead[s] *specific facts* that lead to a *reasonable* inference that the promisor had no intention of performing at the time the promise was made."[117]  And, to reiterate, if such an inference is to be premised on the defendant's knowledge of a particular matter, the plaintiff must allege "sufficient facts from which it can reasonably be inferred that this 'something' was knowable and that the defendants were in a position to know it."[118]

Here, the alleged misrepresentations concern the future profitability of the ASPE Business Unit and the future performance of its management team.  The revenue projections (even if characterized as "promises" as alleged by Buyers) concerned results ASPE and Knier hoped the ASPE Business Unit could achieve in the following four years.  Whether those revenues would, in fact, be achieved was not *knowable* at the time ASPE and Knier made the representations.[119]

---

[116] *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001).

[117] *Hopkins v. Concorde Career Colleges, Inc.*, 2016 WL 1238775, at *3 (D. Del. Mar. 29, 2016).

[118] *Arbry Pr's V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1051 (Del. Ch. 2006).

[119] *See Great Lakes*, 788 A.2d at 554; *Trenwick*, 906 A.2d at 209 ("They are simply statements of expectation or opinion about the future of the company and the hoped for results of business strategies.  Such opinions and predictions are generally not actionable under Delaware law.").

Buyers' conclusory allegation that ASPE and Knier knew the statements were false when made because the ASPE Business Unit significantly missed its targeted revenues is legally insufficient to support a fraudulent inducement claim. The fact that actual performance falls short of forecasted performance "does not buttress a fraud claim."[120] Moreover, Buyers fail to "set forth particularized facts regarding the precise estimates in question [and] the circumstances suggesting they were unsound *from the inception* . . . ."[121] The alleged representations about management's abilities and future performance are similarly insufficient; such representations "are mere puffery and cannot form the basis for a fraud claim."[122]

Even if Buyers had pled sufficient facts to satisfy the remaining fraud elements, they have failed to plead facts from which the Court can reasonably infer justifiable reliance. "'Justifiable reliance requires that the representation relied upon involve a matter which a reasonable person would consider important in determining

---

[120] *Trenwick*, 906 A.2d at 208.

[121] *Id.* (emphasis supplied); *see also id.* ("What is necessary is the pleading of facts suggesting that the original estimates were fraudulently conceived, from the get-go. This does not require a plaintiff to probe the mindset of the defendants, what it does require is that the plaintiff set forth particularized facts regarding the precise estimates in question, the circumstances suggesting they were unsound from the inception, and why the defendants had an incentive to intentionally low-ball them.").

[122] *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *2 (Del. Ch. Oct. 19, 2004) (finding statements that a person has "skills, experience, and resources to successfully and quickly capitalize on [an] opportunity" were "mere puffery" unable to support a fraud claim).

his choice of action in the transaction in question,' *i.e.*, that the matter misrepresented is material."[123] "To establish justifiable reliance, [a plaintiff] must demonstrate he did not have either the awareness or opportunity to discover the accurate information."[124]

Here, Buyers were not justified in relying on ASPE and Knier's alleged extra-contractual representations regarding future performance of the business and management capabilities. Buyers were represented by counsel and were able to conduct due diligence without interference by Sellers. Following this process, Buyers entered into a highly-negotiated agreement that *does not* contain the allegedly "promised" revenue thresholds and does not say anything at all about the capabilities of the ASPE team that would continue to manage the ASPE Business Unit. Tellingly, however, the APA *does* contain revenue thresholds required to trigger the Contingent Purchase Price payments. Under these circumstances, the pled facts do not allow a reasonable inference that Buyers could have reasonably relied upon the alleged extra-contractual representations made prior to their due

---

[123] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 813–14 (Del. Ch. Feb. 18, 2014) (quoting *Lock v. Schreppler*, 426 A.2d 856, 863 (Del. Super. Ct. 1981)).

[124] *Tekstrom, Inc. v. Savla*, 2006 WL 2338050, at *11 (Del. Super. Ct. July 31, 2006).

diligence that were not included in the final agreement—even if the APA does not contain an anti-reliance clause.[125]  Thus, Buyers' fraud claim must be dismissed.

## 2.  Count 2 - Breach of Contract

According to Buyers, Section 2.1(f) of the APA "affirmatively obligate[s] the Sellers to develop business plans that enable[] revenue growth."[126]  Buyers contend that Sellers breached Section 2.1(f) by "failing to act in a reasonable manner consistent with ASPE's past practices, fail[ing] to make and execute strategies and plans that enabled the ASPE Business Unit to achieve the promised revenue growth, and fail[ing] to report, budget, and forecast in line with the budgets and forecasts provided by [ASPE] to [Buyers] prior to Closing."[127]  According to Buyers, the APA's requirement that ASPE management conduct "activities in a reasonable manner consistent with its past practices," coupled with Section 2.1(f)'s

---

[125] *See, e.g.*, *Am. Capital Acq. P'rs, LLC v. LPL Hldgs., Inc.*, 2014 WL 354496, at *9 (Del. Ch. Feb. 3, 2014) (finding that, although the contract did not include an anti-reliance clause, "[p]laintiffs could not have reasonably relied on public statements describing LPL's business in non-specific terms and on statements by an LPL executive" where neither made specific promises about the company's abilities); *Great Lakes*, 788 A.2d at 554–55 (finding that plaintiffs were not justified in relying on projected sales regardless of whether they were covered by disclaimers in the agreement).

[126] Buyers' Answering Br. 36 & n.3.

[127] Countercl. ¶ 72.  Buyers further allege that Sellers failed "to adjust sales or marketing strategies"; failed to "find new opportunities to offset the losses in the maturing parts [of] the ASPE Business Unit"; failed to "change or upgrade key leadership personnel"; and "missed on three consecutive operating plans, and demonstrated no ability to make the changes needed to reverse the serious declines."  Countercl. ¶ 56.

33

"requirement" that management provide a plan that "enable[s] revenue growth," reflect that the parties intended Sellers to continue growing the business post-close.[128]

Sellers contend that Count 2 fails to state a breach of contract claim because nothing in the APA requires the ASPE Business Unit to achieve any specific revenue levels or to grow revenues. Specifically, Sellers argue that (1) Section 2.1(f) of the APA merely permits (or encourages)—but does not require—the ASPE Business Unit to grow its revenues after the Transaction; and (2) Count 2 asks the Court to define acting "in a reasonable manner" as meeting non-contractual revenue goals— an unreasonable construction of that contractual provision. Sellers contend that in negotiating Section 2.1(f), the parties merely intended that Sellers would maintain ASPE's pre-Transaction revenue mix and its 10-Money receipts.[129]

To plead a breach of contract claim, a plaintiff must allege (1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) resulting damage to the plaintiff.[130] There is no dispute that the APA is a valid, enforceable contract. The dispute boils down, instead, to whether the Complaint well pleads that Sellers breached the APA's provisions.

---

[128] Buyers' Answering Br. 36 n.3.

[129] Tr. of H'rg Mar. 20, 2018, at 22:4–19.

[130] *Air Prod. & Chems., Inc. v. Wiesemann*, 237 F.Supp.3d 192, 213 (D. Del. 2017).

At this stage, the Court's breach analysis is confined to the contract language and the allegations of breach viewed through a notice pleading lens:

> Under Delaware law, the proper interpretation of language in a contract is a question of law. Accordingly, a motion to dismiss is a proper framework for determining the meaning of contract language. When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning. Only where the contract's language is susceptible of more than one reasonable interpretation may a court look to parol evidence; otherwise, only the language of the contract itself is considered in determining the intentions of the parties.[131]

Under Section 2.1(f) of the APA, the ASPE Business Unit was obliged to

> (i) manage . . . and conduct its activities in a reasonable manner consistent with its past practices . . . and (ii) report, budget and forecast (as requested in line with the budgets and forecasts provided by the Seller to Buyer prior to Closing, where applicable), its educational and financial status to the Buyer and/or the integrated educational institution, if applicable. Notwithstanding the above, the ASPE Business Unit will be afforded the ability to make and execute strategies and plans to grow their business with full cooperation from Buyer provided that those plan are: (sic) fully compliant with all applicable laws, enable revenue growth consistent with the approximate current mix of Program Revenues and non-Program Revenues, and do not result in fiscal year losses or requests for additional capital over the contingent payment period.

The first sentence of Section 2.1(f) clearly requires the ASPE Business Unit to be operated in a particular manner—namely, "in a reasonable manner consistent with its past practices." "Notwithstanding" this requirement, the next sentence "afford[s] [Sellers] the ability to make and execute strategies and plans to grow the[]

---

[131] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

business" (even if not "consistent with its past practices") so long as Sellers' new initiatives "enable revenue growth consistent with the approximate current mix of Program Revenues and non-Program Revenues." Nothing in Section 2.1(f) requires that Sellers grow revenue, however. Buyers' contrary construction twists the words of the provision to create a mandate where none exists.

Although the provision is not ambiguous, the Court is unable to resolve the breach of contract claim as a matter of law on a motion to dismiss. As mentioned, Buyers have also alleged that Sellers breached Section 2.1(f) by operating the ASPE Business Unit in a manner inconsistent with past practices and that Buyers have "been damaged as a result."[132] The question of whether ASPE's post-closing management conducted the ASPE Business Unit "in a reasonable manner consistent with its past practices" is fact intensive.[133] To answer it dispositively, the Court must consider evidence of ASPE's past practices and compare those practices to the practices employed after the Transaction was consummated. Such evidence is not before the Court and, in any event, could not be considered on a motion to dismiss.

---

[132] Countercl. ¶¶ 70–73. Specifically, it is alleged that Knier and his team did nothing but "manag[e] the potential payout of the Total Revenue Payout" (Countercl. ¶ 48) and that the ASPE Business Unit's performance declined as a result (Countercl. ¶¶ 57, 59).

[133] *See, e.g.*, *Victaulic Co. v. Tieman*, 499 F.3d 227, 227 (3d Cir. 2007) ("Because reasonableness is a fact-intensive inquiry, we hold that it should not have been determined on the pleadings.").

Thus, the breach of contract claim (Count 2) is not susceptible to resolution on a motion to dismiss and must proceed to discovery.

### 3. Count 3 - Breach of Fiduciary Duty

As previously noted, Count 3 of the third-party complaint alleges that Knier, Mantica, and Beanland breached their fiduciary duties to Buyers and the ASPE Business Unit "by acting with reckless indifference and deliberate disregard to [Buyers], and failing to act in good faith to maximize the value [for Buyers] and the ASPE Business Unit over the long term."[134]  The third-party defendants argue that Count 3 must be dismissed because (i) it is duplicative of Buyers' breach of contract claim; (ii) Buyers fail to plead facts sufficient to support a breach of fiduciary duty claim (assuming such a duty was owed); and (iii) Knier, Mantica and Beanland were not independent officers but were instead employees subject to Buyers' full oversight and control and, thus, did not owe Buyers and the ASPE Business Unit any fiduciary duties.

I will assume, for purposes of this motion, that the third-party defendants owed fiduciary duties to Buyers and the ASPE Business Unit.[135]  Even so, Count 3

---

[134] Countercl. ¶ 77.

[135] The third-party defendants were officers of the ASPE Business Unit, a part of EA's operations, following the Transaction.  Officers generally owe the same fiduciary duties as directors. *In re Wayport, Inc. Litig.*, 76 A.3d 296, 322 (Del. Ch. 2013) (citing *Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009)).  With that said, because I find the breach of fiduciary duty claim duplicative, I need not, and do not, determine whether the Employment Agreements alter the third-party defendants' relationship to the ASPE

fails because the fiduciary duty claim advanced therein is duplicative of the breach of contract claim advanced in Count 2.

Generally, Delaware "[c]ourts will dismiss [a] breach of fiduciary duty claim where [it] overlap[s] completely [with a breach of contract claim] and arise[s] from the same underlying conduct or nucleus of operative facts" as the breach of contract claim.[136] "To determine whether there is an independent basis for fiduciary claims arising from the same general events, the Court inquires whether the fiduciary duty claims depend on additional facts as well, are broader in scope, and involve different considerations in terms of a potential remedy."[137]

Count 3 alleges that the third-party defendants breached their fiduciary duties by "merely do[ing] enough to secure the potential payout of the Total Revenue Earnout" rather than "maximizing [] value [for Buyers], and the ASPE Business Unit."[138] Count 2 (the contract claim) alleges "ASPE, Knier, Mantica, and Beanland breached their obligations by, among other things: failing to make adjustments or corrections to the ASPE Business Unit's sales or marketing"; "failing to find new

---

Business Unit and EA in such a manner as to eliminate or circumscribe their otherwise extant fiduciary duties.

[136] *Grunstein v. Silva*, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009).

[137] *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at *7 (Del. Ch. Jan. 29, 2015) (internal quotation omitted).

[138] Countercl. ¶ 77.

opportunities to offset the losses in the maturing parts [of] the ASPE Business Unit; and missing on three consecutive operating plans" and "fail[ing] to hit the Promised Revenues and Profits provided to [Buyers] . . . [and] hit each of the 'get-well, recovery' plans."[139] Even a cursory reading of these pled facts reveals that Count 2 and Count 3 are based on the same conduct—failure to meet projections, failure to increase revenues and failure to operate the business consistent with Pre-Transaction practices—and seek the same recovery—damages. Thus, Count 3 is duplicative of Count 2 and, as such, not viable as a matter of law.[140]

## III. CONCLUSION

Based on the foregoing, Buyers' motion to dismiss Count V of Edinburgh's Complaint is **GRANTED.** Sellers' motion to dismiss is **GRANTED** in part, as to Counts 1 and 3 of the Counterclaim and Third-Party Complaint, and **DENIED** in part, as to Count 2 of the Counterclaim and Third Party Complaint.

**IT IS SO ORDERED.**

---

[139] Buyers' Answering Br. 36–37.

[140] *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *7 (Del. Ch. Aug. 16, 2010) ("The breach of fiduciary duty claim will consequently only be allowed 'where it may be maintained independently of the breach of contract claim.' The relevant inquiry then is whether the obligation sought to be enforced arises from the parties' contractual relationship or from a fiduciary duty owed to the shareholders." (citation omitted)).